## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SAVASENIORCARE, LLC,

      Plaintiff/Counterclaim Defendant,

v.

STARR INDEMNITY AND LIABILITY
COMPANY and ASPEN AMERICAN
INSURANCE COMPANY,

      Defendants/Counterclaim Plaintiffs.

Civil Action No.
1:18-cv-01991-SDG

## OPINION AND ORDER

This matter is before the Court on the following:

- Defendant/Counterclaim Plaintiff Starr Indemnity and Liability Company's motion for summary judgment [ECF 207];

- Plaintiff/Counterclaim Defendant SavaSeniorCare, LLC's motion for partial summary judgment [ECF 243];

- Starr's motion for leave to file a First Amended Counterclaim [ECF 318];

- Defendant/Counterclaim Plaintiff Aspen American Insurance Company's motion for leave to file a First Amended Counterclaim [ECF 326];

- Aspen's motion for summary judgment [ECF 332];

- Sava's motion for sanctions against Starr [ECF 347];

- Starr's motion to continue adjudication of its motion for summary judgment and Sava's motion for partial summary judgment [ECF 369];

- Starr's motion for the Court to disregard Sava's opposition to Starr's motion to continue [ECF 377];

- Starr's "first notice" of supplemental persuasive authority [ECF 390];

- Sava's motion to disregard the notice and in further support of its motion for sanctions [ECF 392]; and,

- various motions to seal or redact [ECF 360; ECF 363; ECF 374; ECF 383; ECF 385; ECF 388; ECF 391].

Having reviewed the record, and with the benefit of argument, the Court rules as follows:[1]

## I.    BACKGROUND

### A.    The Starr Policy

In January 2013, Starr issued Policy No. SISIFNL20060613 to Sava (the Starr Policy).[2] Pursuant to a Mid-Term Run-Off Endorsement, the policy provided coverage for any Claim made during the Discovery Period (October 11,

---

[1]    On July 22, 2021, the Court heard oral argument from the parties on all then-outstanding motions. Sava filed an unopposed motion to redact certain portions of the hearing transcript [ECF 385]. The motion is **GRANTED in part and DENIED in part**. The following portions of the transcript shall be redacted before it is made public: 19:25 to 21:24; 25:12 to 25:13; 26:9 to 26:15; 33:23 to 33:24; 41:9 to 41:11; 41:22 to 41:23; 55:2 to 55:6; 87:21 to 87:22; 87:24; 109:18 to 109:19; 109:25; 110:2 to 110:10; 111:10 to 111:20; 113:16 to 113:17; 116:1 to 116:3; 126:4 to 126:11; 129:8 to 129:9; 145:17; 146:10 to 146:13; 147:2 to 147:4.

[2]    ECF 208-1, ¶ 1. *See also* ECF 207-5. The Court does not follow the Starr Policy's formatting convention of bolding defined terms. Unless otherwise defined, capitalized terms herein follow the definition in the Starr Policy.

2013 through October 11, 2019) for any Wrongful Act allegedly committed prior to October 11, 2013.[3] The policy has an aggregate limit of liability of $15 million.[4]

### 1.   Definitions and Exclusions

The Starr Policy contained a provision entitled the Directors & Officers Liability Coverage Section.[5] It defined a Claim to mean (among other things) any:

(1) written demand for monetary, non-monetary or injunctive relief made against any Insured, including, but not limited to, any demand for mediation, arbitration or any other alternative dispute resolution process;

(2) judicial, administrative or regulatory proceeding, whether civil or criminal, for monetary, non-monetary or injunctive relief commenced against an Insured, including any appeal therefrom, which is commenced by:

(i)   service of a complaint or similar pleading . . .

(3) formal civil, criminal, administrative or regulatory investigation of an Insured Person, which is commenced by the filing or issuance of a notice of charges, formal investigative order or similar document . . . .[6]

---

[3]   ECF 207-5, at 113–14 (Endorsement 51).

[4]   *Id*. at 4.

[5]   *Id*. at 19–26.

[6]   *Id*. at 19, 71, 98.

The Starr Policy also defined a Wrongful Act to mean "with respect to the Company, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Company."[7]

### i.   Government Funding Sublimit

Endorsement 50 amended the Directors & Officers Liability Coverage Section as follows:

> b.)   <u>Government Funding – Defense Costs Coverage</u>
>
>> 1.   Loss shall not include the return of any funds received from any federal, state or local governmental agency and any interest, fines or penalties arising out of the return of such funds. **However, solely in the event of a Claim(s) for Wrongful Acts arising out of the return, or request to return such funds, this policy shall pay Defense Costs up to an amount not to exceed $1,000,000 ("Government Funding Sublimit of Liability").** The Government Funding Sublimit of Liability shall be part of, and not in addition to, the Limit of Liability applicable to the Directors & Officers and Employment Practices Liability Coverage Section as set forth in Item 4 of the Declarations.[8]

This section is the Government Funding Sublimit.

---

[7]   *Id.* at 19.

[8]   *Id.* at 110 (emphasis added).

### *ii.*    Conditions

Endorsement 8 amended the General Terms & Conditions Liability Coverage Section of the Starr Policy.[9] It contained three conditions relevant here. First, it stated that "[t]he Insurer does not assume any duty to defend any Claim under this policy. However, the Insurer shall have the right to fully and effectively associate with the Insured in the control, investigation, defense and settlement of any Claim."[10] This is the association condition.

Second, Endorsement 8 provided that:

> The Insured(s) shall defend and contest any Claim made against them. The Insured shall obtain the Insurer's written consent in the selection of defense counsel to represent the Insured as respects any Claim, such consent shall not be unreasonably withheld.
>
> The Insured(s) shall not admit or assume any liability, incur any Defense Costs, enter into any settlement agreement or stipulate to any judgment without the prior written consent of the Insurer. Any Loss incurred by the Insured(s) and/or any settlements or judgments agreed to by the Insured(s) without such consent shall not be covered by this policy.[11]

This is the consent condition.

---

9    *Id.* at 50–52.

10   *Id.* at 50.

11   *Id.*

Finally, Endorsement 8 read that:

> Each and every Insured shall give the Insurer full cooperation and such information as it may reasonably require relating to the defense and settlement of any Claim and the prosecution of any counterclaim, cross-claim or third-party claim, including without limitation the assertion of an Insured's indemnification or contribution rights.[12]

This is the cooperation condition. According to a "no action" clause, "[n]o action may be taken against [Starr] unless, as a condition precedent thereto, there shall have been full compliance with all material terms of this policy."[13]

### B.    The Aspen Excess Policy

Sava purchased an additional $10 million in excess insurance from Aspen, Policy Number MCA9J6V13 (the Aspen Policy), effective for the period from January 31, 2013 to January 31, 2014.[14] This policy generally follows form to the Starr Policy, meaning it provides "insurance excess of the Underlying Limits in accordance with the same terms, conditions, definitions, exclusions and limitations of the [Starr Policy] as they existed on the inception date of this

---

[12]    *Id*.

[13]    *Id*. at 18.

[14]    ECF 243-4 (the Aspen Policy). Where applicable, the Court refers to the Starr and Aspen policies collectively as the "Policies."

Policy."[15] According to its express terms, the Aspen Policy only provided excess

insurance and would not:

> [D]rop down for any reason including, but not limited to:
> (1) non-payment to any extent of the Underlying Limits;
> (2) the existence of a sub-limit of liability in any
> Underlying Policies (unless specifically endorsed
> hereon); or (3) any Underlying Policies containing terms
> and conditions different from the Followed Policy.[16]

## C.   The FCA Actions

Between August 26, 2011 and November 20, 2013, three sealed *qui tam*

lawsuits alleging violations of the False Claims Act (the FCA) were filed against

Sava by former employees (the FCA Actions).[17] On June 26, 2012, the United States

issued a subpoena to Sava.[18] After a series of communications, representatives of

Sava met with the Department of Justice (the DOJ) on September 25, 2014.[19] During

this meeting, the DOJ gave a presentation to Sava demonstrating the government's

claimed total loss due to Sava's alleged FCA violations.[20] On December 9, Sava

---

[15]   *Id*. at 5, 7.

[16]   *Id*. at 5.

[17]   ECF 226-1 (SEALED), ¶ 36.

[18]   *Id*. ¶ 2.

[19]   *Id*. ¶ 9.

[20]   *Id*. ¶ 10.

gave its own presentation to the DOJ.[21] During the following months, Sava and the DOJ engaged in discussions about mediating and settling the FCA Actions.[22]

On July 21, 2015, the United States filed a notice to intervene in the FCA Actions.[23] Sava notified the Insurers about the cases on October 20, 2015.[24] The following day, the FCA Actions were consolidated and the DOJ filed a consolidated complaint against Sava in the Middle District of Tennessee.[25]

### D.   Starr's Coverage Position

On January 19, 2016, Starr sent Sava its initial coverage letter, agreeing to provide defense costs to Sava up to $1 million, but denying any other coverage based on the Government Funding Sublimit.[26] In March 2016 and June 2017, Starr sent letters affirming its coverage position.[27] Sava ultimately initiated this action for coverage on May 7, 2018.[28]

---

21   *Id.* ¶ 14.

22   *Id.* ¶¶ 16–28.

23   *Id.* ¶ 37.

24   *Id.* ¶ 43.

25   *Id.* ¶¶ 37–39.

26   ECF 124-9.

27   ECF 124-10; ECF 124-11.

28   ECF 1.

## II.     DISCUSSION

### A.     Motions for Summary Judgment

Each party has moved for summary judgment. Although the facts overlap and legal issues are intertwined, the Court addresses each motion separately.

### 1.     Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "view the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1177 (11th Cir. 2020) (quoting *Hornsby-Culpepper v. Ware*, 906 F. 3d 1302, 1311 (11th Cir. 2018)). If the non-movant relies on evidence that is "'merely colorable' or 'not significantly probative,' then summary judgment is appropriate." *Deal v. Tugalo Gas Co., Inc.*, 991 F.3d 1313, 1325 (11th Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (cleaned up)). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Anderson*, 477 U.S. at 255). Put another way, to defeat summary judgment, the nonmovant "need only present evidence from which a jury might

return a verdict in [its] favor." *Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988) (quoting *Anderson*, 477 U.S. at 257) (cleaned up).

### 2.   Sava's Motion for Partial Summary Judgment

On February 22, 2021, Sava filed its motion for partial summary judgment.[29] Sava seeks the dismissal of certain affirmative defenses and counterclaims asserted by Starr and Aspen based on this Court's September 29, 2020 Order (the September 29 Order) and the Georgia Supreme Court's decision in *Hoover v. Maxum Indemnity Company*, 291 Ga. 402 (2012). On April 14, 2021, Starr and Aspen filed separate opposition briefs.[30] Sava filed its reply fourteen days later.[31]

#### i.   *Hoover*

In *Hoover*, the Georgia Supreme Court clarified an insurer's options when confronted with a coverage decision:

> Under Georgia law, where an insurer is faced with a decision regarding how to handle a claim of coverage at the same time a lawsuit is pending against its insured, the insurer has three options. First, the insurer can defend the claim, thereby waiving its policy defenses and claims of non-coverage. Second, the insurer can deny coverage and refuse to defend, leaving policy defenses

---

[29]   ECF 243.

[30]   ECF 277; ECF 279. Aspen's motion to file under seal [ECF 360] its unredacted response to Sava's statement of undisputed material facts [ECF 359] is **GRANTED**.

[31]   ECF 303.

> open for future litigation. Or, third, the insurer can
> defend under a reservation of rights.

*Id*. at 404–05 (citations omitted).

According to *Hoover*, what an insurer cannot do is "both deny a claim outright and attempt to reserve the right to assert a different defense in the future." *Id*. at 405. This is because "a reservation of rights is only available to an insurer who undertakes a defense while questions remain about the validity of the coverage." *Id*. Put another way, "[a] reservation of rights does not exist so that an insurer who has denied coverage may continue to investigate to come up with additional reasons on which the denial could be based if challenged." *Id*. at 406.

### ii.    The Court's September 29 Order

In its September 29 Order, the Court granted Sava's motion for partial summary judgment on Starr's and Aspen's affirmative defenses and counterclaims premised on a late-notice defense.[32] The Court made two findings important to Sava's present motion. First, in the absence of Georgia law analyzing the issue, the Court concluded:

> Given the principles embodied in *Hoover* and its
> progeny . . . invoking a policy's sublimit of liability
> provision constitutes a 'denial' of all other coverages for

---

[32]   ECF 192.

purposes of determining whether any subsequently noticed defenses have been waived.[33]

Second, the Court found that "the Insurers failed to properly reserve their rights to a late-notice defense."[34] Specifically, the unrefuted record showed that "[n]one of [Starr's] [coverage] letters denied coverage based on, cited to, or referenced the Notice Provision or a late-notice defense."[35] Applying *Hoover* to the undisputed facts, the Court found the Insurers waived the right to assert a late-notice policy defense.

### iii.   Discussion

In its current motion, Sava again requests summary judgment on certain affirmative defenses and counterclaims asserted by Starr and Aspen. This time, Sava takes aim at the three policy conditions—consent, association, and cooperation—raised in the Insurers' motions for summary judgment. But the issues here are distinct from those previously adjudicated and further removed from the parameters of *Hoover*.

The Court's September 29 Order only narrowly concerned any potential late-notice defense that should have been raised in the first instance. Pertinent to

---

[33]   *Id*. at 21.

[34]   *Id*.

[35]   *Id*. at 19.

Sava's instant motion, Starr's first coverage letter invoked the Government Funding Sublimit, expressly agreeing to provide up to $1 million in defense costs, but denying all other coverage. By doing so, Starr did not forgo its right to require Sava's compliance with the terms of the policy *up to that sublimit*. In this Court's view, the principles of *Hoover*—*i.e.*, denying coverage solely on one basis, then investigating further to later assert a separate basis for denial—are not applicable here. Starr did not waive the three conditions as to the sublimit. The conditions were a necessary part of Sava's entitlement to defense costs under the sublimit pursuant to the "no action" provision. *Cf. N. Am. Specialty Ins. Co. v. Bull River Marina, LLC*, 709 F. App'x 623, 631 (11th Cir. 2017) ("It seems to us that *Hoover* would only prohibit [an insurer] from asserting a policy defense . . . that it should have raised the first time around.").

### a.   Starr's Coverage Letters

What's more, the September 29 Order is distinguishable based on the reservation of rights in Starr's coverage letters. Unlike any late-notice defense, Starr repeatedly identified all three policy conditions in those letters. For example, in its initial letter, Starr informed Sava that:

> Pursuant to Clause 6 of the Policy, as amended by Endorsement 8, Starr does not assume any duty to defend any Claim, but has the right to fully and effectively associate with the Insureds in the control,

investigation, defense, and settlement of any Claim. Under Section VII, however, the Insureds shall defend and contest any Claim made against them.

Please advise us of the Insured's selection of defense counsel so that we may discuss staffing, experience and hourly rates. Defense counsel should be forwarded a copy of the attached Starr Indemnity & Liability Company Litigation Management Guidelines for compliance.

With respect to the defense of this matter, we also would like to direct your attention to Clause 6, as amended by Endorsement No. 8, which provides in pertinent part:

> The Insured(s) shall not admit or assume any liability, incur any Defense Costs, enter into any settlement agreement or stipulate to any judgment without the prior written consent of the Insurer. Any Loss incurred by the Insured(s) and/or any settlements or judgments agreed to by the Insured(s) without such consent shall not be covered by this policy. However, the Insurer's consent is not required for the Insured to settle a Claim for a Loss amount within the applicable Retention.

We also request that you or defense counsel provide us with (1) a case management plan and budget; (2) copies of all defense bills rendered to date and copies of all forthcoming defense bills; and (3) updates as to the status of this matter at least every ninety days (or more frequently if events require). Finally, we request that you

arrange a teleconference with defense counsel so we can
discuss the status of the Complaint.[36]

In its second coverage letter, Starr again raised these policy conditions, as
well as its concerns regarding Sava's decision to employ half a dozen attorneys,
law firms, and consultants in its defense of the FCA Actions.[37] Starr reiterated these
issues in its third coverage letter.[38] These reservations were sufficient to inform
Sava of Starr's position and that Starr intended to demand compliance with the
policy conditions in connection with the Government Funding Sublimit. The
coverage letters were also enough to communicate that Starr would require Sava's
adherence to the conditions with regard to any other coverage under the Starr
Policy. *World Harvest Church, Inc. v. GuideOne Mut. Ins. Co.*, 287 Ga. 149, 152 (2010)
("At a minimum, the reservation of rights must fairly inform the insured that,
notwithstanding the insurer's defense of the action, it disclaims liability and does
not waive the defenses available to it against the insured.") (citations omitted)
(cleaned up). Aspen similarly informed Sava in its initial coverage letter that

---

[36]   ECF 124-9.

[37]   ECF 124-10, at 7.

[38]   ECF 124-11.

Aspen was enforcing the cooperation condition.[39] Aspen later adopted the position set forth in Starr's initial coverage letter.[40]

### iv.   Conclusion

As regards the Government Funding Sublimit, Starr and Aspen did not waive these policy conditions under *Hoover*. To the extent they waived a right to rely on the three conditions in connection with other coverage under the Policies—an issue discussed further below—it was not because of any application of *Hoover* or the Court's September 29 Order. Accordingly, Sava's motion for partial summary judgment is **DENIED**.[41]

---

[39]   ECF 137-4.

[40]   ECF 243-11.

[41]   Two days before the Court heard oral argument, Starr filed a motion to continue adjudication of Sava's motion for summary judgment in the event the Court found genuine issues of material fact [ECF 369]. Specifically, Starr asked the Court to wait until the parties complete the ESI protocol [ECF 328] before ruling. Starr also asserts in a notice that the draft report of the third-party ESI examiner further supports its contention that the Court should delay ruling [ECF 390]. Sava belatedly opposed the motion to continue [ECF 376], and Starr replied [ECF 381]. Starr also filed a motion asking the Court to disregard Sava's late opposition brief [ECF 377], to which Sava responded [ECF 384], and Starr replied [ECF 386]. Sava moves for the Court to disregard Starr's notice [ECF 392].

The Court concludes that a continuation is not warranted. Given the posture of the case, a further delay in resolving key issues would not benefit any party. Indeed, it has already led to more protracted litigation, such as interim filings seeking various forms of relief [*see, e.g.*, ECF 377; ECF 378; ECF 390]. Moreover, in light of the Court's substantive rulings, there is no need for a continuation.

### 3.   Starr's Motion for Summary Judgment

On November 2, 2020, Starr filed its motion for summary judgment.[42] According to Starr, Sava's coverage claims are barred as a matter of law because Sava breached each of the consent, association, and cooperation conditions. Alternatively, Starr requests that the Court declare that Sava's claims against Starr are capped at $1 million under the Government Funding Sublimit. On December 2, Sava filed its response in opposition to Starr's motion.[43] Starr filed its reply on December 30.[44] Because application of the language in the Government Funding Sublimit resolves Starr's motion, the Court addresses this argument first.

### i.   Government Funding Sublimit

As an alternative argument, Starr asks the Court to find that Sava's claims are limited by the Government Funding Sublimit. That section provides:

> Loss shall not include the return of any funds received
> from any federal, state or local governmental agency and

---

Starr's motion to continue [ECF 369] is therefore **DENIED AS MOOT**. Starr's motion to disregard Sava's opposition [ECF 377] is **DENIED**. However, Starr's motion to file under seal [ECF 383] its unredacted motion to continue and an exhibit thereto, as well as its reply in support of the motion to continue is **GRANTED**. Starr's motion to file under seal [ECF 388] its reply in support of its motion to continue and two exhibits thereto is also **GRANTED**.

[42]   ECF 207.

[43]   ECF 225.

[44]   ECF 235.

> any interest, fines or penalties arising out of the return of such funds. **However, solely in the event of a Claim(s) for Wrongful Acts arising out of the return, or request to return such funds, this policy shall pay Defense Costs up to an amount not to exceed $1,000,000**.

Any recovery by Sava would be capped at $1 million under this provision, assuming Sava otherwise met the policy requirements. Sava argues this provision is inapplicable because the Starr Policy does not expressly exclude coverage for claims arising under the FCA. Sava suggests that "a reasonable interpretation of the [Government Funding Sublimit] is that it would apply to requests to return specific funds or overpayments pursuant to the CMS audit/recovery procedures, and civil money penalties . . . ."[45]

### *a.*    **Applicable Law**

A question of "[i]nsurance policy interpretation is appropriately decided at summary judgment." *Auto-Owners Ins. Co. v. Cribb*, No. 2:17-cv-106-RWS, 2019 WL 451555, at *4 (N.D. Ga. Feb. 5, 2019) (citing *Giddens v. Equitable Life Assurance Soc'y of the U.S.*, 445 F.3d 1286, 1297 (11th Cir. 2006) ("[T]he interpretation of an insurance policy, including the determination and resolution of ambiguities, is a question of law for the court to decide.")). *See also* O.C.G.A. § 13-2-1 ("The construction of a contract is a question of law for the court."). The Court's

---

45   ECF 225, at 22.

mandate is to "ascertain the parties' intention by examining the contract as a whole." *Lyons v. Allstate Ins. Co.*, 996 F. Supp. 2d 1316, 1319 (N.D. Ga. 2014).

Under Georgia law, "insurance is a matter of contract, and the parties to an insurance policy are bound by its plain and unambiguous terms." *Old Republic Union Ins. Co. v. Floyd Beasley & Sons, Inc.*, 250 Ga. App. 673, 675 (2001). "As is the case with all contracts, unambiguous terms of an insurance policy require no construction, and the plain meaning of such terms must be given full effect, regardless of whether they might be beneficial to the insurer or detrimental to the insured." *Cont'l Cas. Co. v. H.S.I. Fin. Servs., Inc.*, 266 Ga. 260, 262 (1996). *See also Winders v. State Farm Fire & Cas. Co.*, 359 F. Supp. 3d 1274, 1277 (N.D. Ga. 2018) (same). "Where the contractual language unambiguously governs the factual scenario before the court, the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured." *Trinity Outdoor, LLC v. Cent. Mut. Ins. Co.*, 285 Ga. 583, 585 (2009).

### *b.*  **Discussion**

The Court finds no ambiguities in the language of the Government Funding Sublimit. It makes clear that a covered Loss does ***not*** include "the return of any

funds received from any federal, state or local governmental agency and any interest, fines or penalties arising out of the return of such funds."[46]

The three original *qui tam* complaints alleged that Sava had submitted false or fraudulent claims for payment under the Medicare, Medicaid, and Tricare programs.[47] When the government filed its consolidated complaint in October 2015, the pleading sought "damages" and "treble damages" under the FCA.[48] Sava therefore insists that these terms mean the government was not seeking the "return of funds received."[49] Sava also contends that, since other insurers specifically bar claims for FCA violations, the Starr Policy cannot be read to do the same when the Government Funding Sublimit does not use the words "False Claims Act."[50] Sava's arguments are misplaced.

Reading the Starr Policy as a whole and interpreting the Government Funding Sublimit's exclusion from the definition of Loss narrowly, it is still clear from the sublimit's language that it applies to more than just instances in which

---

[46]   ECF 207-5, at 110.

[47]   ECF 225-2, ¶ 36. Although Sava denies that it submitted false or fraudulent claims, it does not deny that this is what the complaints alleged. *Id.*

[48]   *Id.* ¶ 42.

[49]   ECF 225, at 20.

[50]   *Id.* at 21.

the government attempts to recoup through CMS audit/recovery procedures amounts wrongfully paid. It applies to any processes and claims the government might use to obtain the return of funds—such as FCA claims.[51] Sava argues that Endorsement 50 expressly includes alleged violations of the Emergency Medical Treatment and Active Labor Act under the definition of Claim; ergo, if the Government Funding Sublimit had been intended to cover FCA claims, it would have expressly said Loss does not include such claims.[52] Similarly, Sava points to insurance policies issued by other insurers to argue the Starr Policy could not have been intended to cover claims under the FCA.[53] But the sublimit is not so restrictive as Sava contends.

Regardless of the name applied by the government to the relief it sought in the FCA Actions, it was attempting to recover funds paid to Sava because of Sava's alleged Medicare fraud:

> The United States brings this False Claims Act action against [Sava] to recover millions of dollars that Sava caused the Medicare program to pay for rehabilitation therapy services . . . . Sava submitted false or fraudulent claims for payment to Medicare for these rehabilitation

---

[51]   ECF 207-5, at 110.

[52]   ECF 225, at 26.

[53]   *See, e.g., id.* at 25–26.

> therapy services and knew or should have known that
> these services were not eligible for reimbursement . . . .[54]

In its cause of action for payment by mistake, the government alleged that it

> paid more money to defendants [ ] than it would have
> based on the erroneous belief that the defendants were
> entitled to reimbursement . . . . The United States, acting
> in reasonable reliance that the [d]efendants' claims were
> accurate, complete, and truthful, paid defendants [ ]
> certain sums of money to which [they were] not entitled
> and thus defendants [ ] are liable to account and pay to
> the United States such amounts . . . .[55]

The government's own description of what it was seeking in the FCA Actions fits

within the plain meaning of "the return of any funds received." The consolidated

complaint could not have been more clear about what the government wanted:

The United States sought to reacquire funds it allegedly wrongfully paid to Sava.

"Giving, as we must, unambiguous policy terms their ordinary dictionary

meaning, we must consider return to mean to revert to a former owner or to give

back to the owner." *AEGIS Elec. & Gas Int'l Servs. Ltd. v. ECI Mgmt. LLC*, 967 F.3d

1216, 1225 (11th Cir. 2020) (cleaned up) (citations omitted) (construing policy

language as excluding from definition of "loss" any return or reduction of sums in

the possession, custody, or control of the insured). Likewise, the civil penalties and

---

[54]   ECF 225-9, ¶ 1 (citation omitted).

[55]   *Id.* ¶¶ 210–11.

treble damages the government sought were fines and penalties "arising out of" the government's efforts to obtain the return of the wrongfully paid funds. The Government Funding Sublimit was properly invoked by Starr and the amounts sought as damages in the FCA Actions were not a covered Loss under Endorsement 50 of the Starr Policy.[56]

Moreover, Loss includes Defense Costs. Thus, Defense Costs beyond the $1 million sublimit are not covered: "[S]olely in the event of a Claim(s) for Wrongful Acts arising out of the return, or request to return such funds, this policy shall pay Defense Costs up to an amount not to exceed $1,000,000."[57] Whether Sava is entitled to recover any amounts under that sublimit is discussed further below.

### ii.    The Conditions Precedent

Since Starr properly invoked the Government Funding Sublimit, it is of no import whether the consent, association, and cooperation conditions were satisfied with regard to any provision in the Starr Policy *other than* the sublimit. To the extent Starr contends Sava was required to comply with the conditions for amounts Starr had already refused to cover, Starr misapplies Georgia law. For the same reason, Sava's contention that Starr "wholly abandoned" it is also incorrect.

---

[56]   ECF 207-5, at 110.

[57]   *Id.* at 5 §§ B, C; *id.* at 10 ¶ 3; *id.* at 110.

### a.    Amounts Outside of the Government Funding Sublimit

"In Georgia, an insurer that denies coverage and refuses to defend an action against its insured, when it could have done so with a reservation of its rights as to coverage, waives the provisions of the policy against a settlement by the insured and becomes bound to pay the amount of any settlement within a policy's limits made in good faith, plus expenses and attorneys' fees." *S. Guar. Ins. Co. v. Dowse*, 278 Ga. 674, 676 (2004) (cleaned up). This makes sense: When an insurer denies coverage, there is no reason for the insured to comply with policy conditions related to that coverage and the insurer cannot defend by asserting the insured failed to comply. "*Dowse* [ ] indicate[s] that an insurer cannot wholly abandon its insured and then attempt to shield itself with a no settlement clause *if the claim was covered by the policy*." *Trinity Outdoor*, 285 Ga. at 587 (emphasis added).

In doing so, however, an insurer does not waive its ability to assert that the loss is not covered by the policy in the first place. In other words,

> By refusing to defend . . . [insurer] did not waive its right to contest its insured's assertion that the insurance policy provides coverage for the underlying claim. Obviously, if the underlying claim is outside the policy's scope of coverage, then [insurer's] refusal to indemnify or defend was justified and it is not liable to make payment within the policy's limits.

*Dowse*, 278 Ga. at 676 (citation omitted).

Here, Starr denied coverage for everything other than the Defense Costs permitted under the Government Funding Sublimit. This obviated the need for Sava to comply with the consent, association, and cooperation conditions except with regard to that sublimit. Requiring such compliance as a condition of coverage that has already been denied makes no sense:

> Liability policies generally include provisions that prohibit an insured from settling claims without the insurer's approval. These provisions enable insurers to control the course of litigation concerning such claims, and also serve to prevent potential fraud, collusion and bad faith on the part of insureds. However, an insurer has a correlative duty to defend its insured against all claims covered under a policy, even those that are groundless, false, or fraudulent. An insurer that refuses to indemnify or defend based upon a belief that a claim against its insured is excluded from a policy's scope of coverage [does] so at its peril, and if the insurer guesses wrong, it must bear the consequences, legal or otherwise, of its breach of contract.

*Id.* (cleaned up) (alteration in original). The cases debated by counsel during oral argument—*Trinity Outdoor* and *Piedmont Office*—are not to the contrary.

### 1.    *Trinity Outdoor*

In *Trinity Outdoor, LLC v. Central Mutual Insurance Company*, the Georgia Supreme Court answered a question certified to it by a court in this district about the requirements of an action for negligent or bad faith refusal of an insurer to settle a case. 285 Ga. 583 (2009). When Trinity was sued by the family of two men

who had been killed on its property, its insurance carrier, Central Mutual Insurance Company (Central), provided outside counsel and ultimately offered to pay $200,000 toward a settlement with the family. The policy limit was $2 million. The litigation between Trinity and the family ultimately settled for $12 million, of which Trinity agreed to pay—without Central's approval—slightly less than $1 million. In subsequent litigation between Trinity and Central, Central argued that any amount paid by Trinity in excess of the $200,000 Central had agreed to cover was a voluntary payment not encompassed by the policy, and that Trinity was not entitled to sue under the policy because it had breached policy conditions, including a consent requirement. The policy contained a "no action" clause, prohibiting suit against Central unless the insured complied with all policy terms.

Trinity objected that Central's attempt to enforce these provisions was prohibited by *Dowse*. The Georgia Supreme Court rejected this argument, emphasizing that, under *Dowse*, an insurer waives policy provisions against a settlement by the insured when the insurer has denied coverage *if* the underlying claim is covered by the policy. *Id.* at 586. Here, while Starr may have waived any ability to enforce the three conditions for amounts unrelated to the sublimit, those amounts are nevertheless excluded from coverage by that same sublimit.

### 2.    *Piedmont*

Six years after issuing *Trinity Outdoor*, the Georgia Supreme Court again weighed in on these issues in *Piedmont Office Realty Trust, Inc. v. XL Specialty Insurance Company*, 297 Ga. 38 (2015). There, the insurer (XL) agreed to contribute $1 million toward a settlement of claims against Piedmont (out of a $6 million remaining limit under an excess policy). Without obtaining XL's consent, Piedmont then agreed to settle the underlying litigation for nearly $5 million. In response to certified questions (this time from the Eleventh Circuit), the Georgia Supreme Court rejected "the assertion that, because XL denied coverage, it is estopped from insisting that Piedmont needed to obtain its consent prior to settling the underlying lawsuit." *Id.* at 43. That's because, in denying coverage, XL did not "wholly abandon" Piedmont; rather, XL provided a defense and coverage under the excess policy throughout the underlying litigation. *Id.*

Starr agreed to provide Defense Costs, under the Government Funding Sublimit, up to $1 million. Though Sava may find that amount inconsequential relative to its liability as a whole, it is hardly abandonment. To the extent Starr agreed to this sublimit, Sava was required under *Piedmont* to comply with the consent, association, and cooperation conditions. For the coverage Starr wholesale denied, it correctly applied the policy exclusion. Had Starr made an incorrect

determination in that regard, *Southern Guaranty*, *Trinity Outdoor*, and *Piedmont* dictate that Starr would not have been entitled to enforce the conditions.

> **b.    Compliance with the Conditions in Connection with the Government Funding Sublimit**

> *1.    Consent*

Starr argues it is entitled to summary judgment because Sava breached the consent condition. Consent conditions are valid and enforceable under Georgia law. *Piedmont Off. Realty Tr.*, 297 Ga. at 41; *Trinity Outdoor*, 285 Ga. at 585. An insurer need not demonstrate prejudice to invoke such a condition. *See Cincinnati Ins. Co. v. Stone*, 488 F. Supp. 3d 1279, 1285–86 (N.D. Ga. 2020). Here, Endorsement 8 to the Starr Policy required Sava to obtain Starr's written consent: (1) in the selection of defense counsel, (2) prior to assuming any liability or entering into any settlement agreement, or (3) before incurring any Loss. The Defense Costs provided for in the sublimit are included within the meaning of Loss;[58] indeed, the parties do not argue that Endorsement 8 is inapplicable to the sublimit. After Starr notified Sava of its initial coverage position, Sava participated in a conference call with Starr's claims handler, who did not raise an objection to Sava's litigation

---

[58]    ECF 207-5, at 5 §§ B, C; *id.* at 10 ¶ 3.

strategy.[59] Sava concedes, however, that it never obtained Starr's written consent to its defense arrangements before incurring costs.[60]

Numerous courts have rejected a theory of constructive consent as sufficient to satisfy a written consent condition precedent. *See, e.g., Int'l Ins. Co. v. RSR Corp.*, 148 F. App'x 226, 230 n.3 (5th Cir. 2005); *Paulus Sokolowski & Sartor, LLC v. Cont'l Cas. Co.*, No. CIV. A. 12-7172 MASTJ, 2013 WL 11084770, at *6 (D.N.J. Aug. 30, 2013); *Botany Bay Marina, Inc. v. Great Am. Ins. Co.*, 760 F. Supp. 88, 91 (D.S.C. 1991); *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 491 (Tex. 2019). The Court declines to read such a condition into the clear language of the Starr Policy, which expressly requires *written* consent.

As to Sava's argument that Starr's coverage position foreclosed its ability to demand compliance with the consent condition, the Court disagrees. Starr did not "wholly abandon" Sava; it never entirely refused to provide coverage, but indicated that coverage for Defense Costs under the sublimit was available. Starr therefore had the right to demand compliance with all applicable terms of the Starr Policy pursuant to the "no action" clause. *Piedmont*, 297 Ga. at 43. Absent Starr's written consent, Sava breached the policy.

---

[59]   ECF 226-4 (SEALED), ¶¶ 13–18.

[60]   ECF 226-2 (SEALED), ¶¶ 51–53.

But that is not the end of the inquiry. Although the Starr Policy required Sava to obtain written consent from Starr, the plain language of Endorsement 8 required that Starr not unreasonably withhold such consent.[61] Even without that express language, Georgia law imposes a reasonableness requirement. *See, e.g.*, *Piedmont*, 297 Ga. at 42 ("[E]ven without such an express provision in its policy, an insurer cannot unreasonably refuse to settle a covered claim."). There is, however, no dispute of material fact sufficient to demonstrate that Starr unreasonably withheld consent.

Sava contends that the unrebutted evidence about its conversations with the Starr claims handler shows unreasonableness.[62] Sava points to an email from AON (Sava's insurance broker) to Starr in February 2016 providing the list of counsel and consultants Sava had *already* engaged and their hourly rates[63] and the aforementioned conference call as proof of Starr's unreasonableness. But Sava has not identified any particular evidence showing that (1) it expressly sought consent from Starr to engage these professionals or incur Defense Costs; (2) Starr either explicitly or tacitly refused to sign off on Sava's (then) six chosen firms; or (3) any

---

61   ECF 207-5, at 50.

62   *See generally* ECF 226-4 (SEALED).

63   *Id.* at 14–15 (SEALED).

such refusal was unreasonable as a matter of law. The February 2016 email itself makes no specific request for consent (although communications between AON and Sava indicate this was supposed to be the purpose of the communications with Starr).[64] The conference call plainly is not a substitute for written consent.

Nor does the evidence reveal a material question of fact about whether Starr unreasonably withheld consent; rather, there is every indication that Sava never expressly requested written consent and simply dropped the issue after the parties' conference call. Starr, by contrast, points to months of "radio silence" from Sava in response to repeated requests from Starr and AON.[65] Sava counters by suggesting that Starr was somehow at fault for not objecting to Sava's choice of counsel.[66] This improperly flips the parties' obligations under the Starr Policy, which mandated that *Sava* obtain written consent before engaging legal counsel and incurring Defense Costs. It did not do so.

Sava has cited *Crazy Cuban, LLC v. AmGuard Insurance Co.*, 437 F. Supp. 3d 1261 (N.D. Ga. 2020), for the proposition that there can be an implied waiver of a

---

[64]   *Id.* at 19 (SEALED).

[65]   ECF 207-1, at 12–13.

[66]   ECF 225, at 11–12.

condition through an insurer's silence and inaction.[67] In that case, however, "Plaintiff actively engaged and cooperated with Defendant to reach an agreement regarding the total amount of various categories of losses. Defendant rejected Plaintiff's informally edited proofs of loss and ceased communications with Plaintiff before the parties reached an agreement." *Id.* at 1268. By contrast, Sava has pointed to no evidence showing it made any actual effort to obtain the required written consent or that Starr ignored such efforts. *Crazy Cuban*, moreover, did not involve a condition precedent to a coverage suit.

No material facts are in dispute concerning the consent condition and it is appropriate to grant Starr's motion for summary judgment on this ground as it relates to the Government Funding Sublimit. The Court need not reach Starr's remaining arguments for summary judgment based on the association and cooperation conditions, but will do so for purposes of completeness.

### 2.      Association

Starr argues it is entitled to summary judgment because Sava breached the association condition. A "right to associate" condition exists "to provide the insurer with an 'option to intervene' in the defense and settlement of a claim."

---

[67]    *Id.*

*MBIA Inc. v. Fed. Ins. Co.*, 652 F.3d 152, 167 (2d Cir. 2011) (collecting cases). *See also*

*N. River Ins. Co. v. Philadelphia Reinsurance Corp.*, 797 F. Supp. 363, 370 (D.N.J. 1992)

(stating the "right to associate gives [an insurer] adequate means by which to keep

informed of events that may give rise to coverage under its agreement, and also

provides a sufficient means to protect its own interests"). As noted in *MBIA*, "the

right to associate is useful only if the insurer can use its experience throughout the

process, not just at the end stages." 652 F.3d at 167. During oral argument, Starr's

counsel divided the right to associate into two time periods: before and after

October 20, 2015, the date Sava disclosed the FCA actions to Starr.

Endorsement 8 conferred on Starr the "right to fully and effectively associate

with [Sava] in the control, investigation, defense and settlement of any Claim."[68]

Although the precise date Sava or its representatives learned of any of the FCA

Actions remains somewhat unclear, it is undisputed that, between September 2014

and May 2015, Sava (1) received copies of the sealed *qui tam* complaints,

(2) engaged in communications with representatives of the DOJ, (3) received and

gave presentations regarding the *qui tam* complaints, and (4) made two—and

received one—offers of settlement.

---

[68]   ECF 207-5, at 50.

Starr asserts that Sava did not allow it to associate in the FCA Actions before October 20, 2015 because Sava did not disclose the litigation.[69] After that point, Starr contends Sava did not provide the information Starr requested in order to be able to associate effectively. This timeline could raise concerns as to whether Sava timely alerted Starr so that it could invoke its contractual right of association, but Sava posits the sealed *qui tam* complaints did not constitute a Claim within the meaning of the Starr Policy.

The policy defines Claim to mean any

> (4) written demand for monetary, non-monetary or injunctive relief made against any Insured, including, but not limited to, any demand for mediation, arbitration or any other alternative dispute resolution process;

> (5) judicial, administrative or regulatory proceeding, whether civil or criminal, for monetary, non-monetary or injunctive relief commenced against an Insured, including any appeal therefrom, which is commenced by:

> > (i) service of a complaint or similar pleading . . .

> (6) formal civil, criminal, administrative or regulatory investigation of an Insured Person, which is commenced by the filing or issuance of a notice of

---

69   ECF 236, at 13 (SEALED).

charges, formal investigative order or similar document . . . .[70]

### (i)    Before October 20, 2015

Starr asserts that the complaints in the FCA Actions were Claims because they were written demands for monetary relief.[71] Under Starr's theory, however, *every* unserved pleading that asks for any form of relief would fall into the "written demand" definition in paragraph (4). Interpreting the policy in this manner would effectively render meaningless the definition of Claim in paragraph (5), which requires that a pleading have been *served*.[72]

"The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part." O.C.G.A. § 13-2-2(4). And "when a provision specifically addresses the issue in question, it prevails over any conflicting general language." *Deep Six, Inc. v. Abernathy*, 246 Ga. App. 71, 74 (2000) (citation omitted). The Starr Policy "should [therefore] be construed, if possible, so as to give effect to all its

---

[70]  *Id*. at 19, 71, 98.

[71]  *Id.* at 13–14 (SEALED).

[72]  *See, e.g.*, ECF 225, at 16 (Sava arguing that, "[if] any complaint is also a 'written demand,' then the distinct subpart that specifically concerns service would be rendered meaningless and superfluous") (citing *Deep Six, Inc. v. Abernathy*, 246 Ga. App. 71, 74 (2000)).

provisions, so as to render none meaningless." John K. Larkins, Jr. & Hon. John K. Larkins III, GA. CONTRACTS LAW AND LITIGATION § 9:2. (2d ed. Sept. 2020 Update) (citations omitted).

In context, paragraph (4) of the definition of Claim most clearly and logically refers to a formal demand that initiates a type of alternative dispute resolution process (*i.e.*, a proceeding that is *not* in a court) or an actual demand letter issued in advance of such process. *See, e.g.*, Demand Letter, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A letter by which one party explains its legal position in a dispute and requests that the recipient take some action (such as paying money owed), or else risk being sued. Under some statutes (esp. consumer-protection laws), a demand letter is a prerequisite for filing a lawsuit."). Interpreting paragraph (4) as broadly as Starr counsels would render paragraph (5) without meaning because an unserved pleading would always be a written demand.

For these reasons, the Court does not find persuasive the case cited by Starr in support of its argument, *Medical Depot, Inc. v. RSUI Indemnity Company*, Civ. A. No. N15C-04-133 EMD CCLD, 2016 WL 5539879, at *8–*9 (Del. Super. Sept. 29, 2016), or the cases relied on in *Medical Depot*.[73] Further, none of those cases apply

---

[73]   ECF 236, at 13 n.27.

Georgia law and some of them do not involve policies defining claim to require service of a pleading.

Even if paragraph (4) were ambiguous (and the Court does not find that it is), it would not change this application because the provision must be interpreted against Starr: "[W]hen a policy provision is susceptible to more than one meaning, even if each meaning is logical and reasonable, the provision is ambiguous and, pursuant to [O.C.G.A.] § 13–2–2(5), will be construed strictly against the insurer/drafter and in favor of the insured." *Ga. Farm Bureau Mut. Ins. Co. v. Smith*, 298 Ga. 716, 719 (2016). As a result, the Court concludes as a matter of law that Sava did not fail to permit Starr to associate during the pre-October 20, 2015 period because at that point there was no "Claim."

### (ii)   After October 20, 2015

After October 20, 2015, the date Sava disclosed the FCA Actions to Starr, Starr contends Sava failed to provide the information necessary for Starr to be able to associate effectively. Sava retorts that Starr failed to exercise its right to associate, leaving "Sava to fend for itself."[74] However, Sava makes this argument primarily in connection with Starr's asserted right to associate with regard to

---

[74]   ECF 225, at 18. *See generally id.* at 18–20; ECF 226-4 (SEALED) ¶¶ 11–30.

matters for which Starr had already denied coverage—not in connection with Sava's ability to collect up to $1 million in Defense Costs under the Government Funding Sublimit. Starr contends that, despite multiple requests over 18 months, Sava failed to respond. And Starr asserts that Sava, as the policy holder, cannot dictate to Starr how it should have "associated."

While the Court finds that this is a relatively close question, there exists a material dispute about whether Starr (1) tried to associate and was prevented from doing so because of Sava's conduct or (2) abandoned attempts to associate with regard to the Government Funding Sublimit. As a result, the association condition does not provide a basis for entering summary judgment in favor of Starr for that sublimit after October 20, 2015.

### 3.    Cooperation

Starr also argues it is entitled to summary judgment because Sava breached the cooperation condition. Under Georgia law:

> To justify the denial of coverage for an insured's non-cooperation . . . the insurer must establish: (a) that it reasonably requested the insured's cooperation in defending against the plaintiff's claim, (b) that its insured willfully and intentionally failed to cooperate, and (c) that the insured's failure to cooperate prejudiced the insurer's defense of the claim.

*Travelers Home & Marine Ins. Co. v. Castellanos*, 297 Ga. 174, 177 (2015). The Court may decide the issue of cooperation as a matter of law on summary judgment, *KHD Deutz of Am. Corp. v. Utica Mut. Ins. Co.*, 220 Ga. App. 194, 196, (1996), but concludes it is not appropriate to do so here.

Endorsement 8 required Sava to "give [Starr] full cooperation and such information as it may reasonably require relating to the defense and settlement of any Claim."[75] For many of the same reasons as discussed above concerning the association condition, this issue cannot be resolved on summary judgment. Although there is plenty of evidence that Sava went "radio silent" and did not provide Starr with the information it requested from January 2016 through November 2017, there remain material issues of fact about whether Sava's conduct was willful and intentional. Starr points to circumstantial evidence to support the contention that Sava acted deliberately,[76] but Sava notes that Starr's information requests were not reasonable in light of its coverage denial.[77] Sava also asserts that its failures to respond to Starr's requests resulted from Starr's own lack of

---

[75]   ECF 207-5, at 50.

[76]   ECF 208 (SEALED), at 22–24.

[77]   ECF 225, at 21.

diligence.[78] The uncontroverted testimony of Sava's in-house counsel is that his failure to promptly respond to Starr's direct and indirect inquiries was neither willful nor intentional.[79] The Court cannot resolve this factual dispute on summary judgment. Therefore, the cooperation condition does not serve as a further basis for entering summary judgment in favor of Starr.

### *iii.* Conclusion

Starr's motion for summary judgment is **GRANTED IN PART and DENIED IN PART**. Starr correctly denied coverage other than that permitted under the Government Funding Sublimit. It would not, however, have been entitled to enforce the three policy conditions with respect to the coverage it denied. Sava did not obtain Starr's written consent as to defense counsel or before incurring Defense Costs that were included within the Government Funding Sublimit. It thus breached a condition precedent to suit under the Starr Policy. Therefore, summary judgment is warranted in favor of Starr on that basis. Although the Court need not reach the issues of association or cooperation in connection with the sublimit, it concludes that they are not appropriate for resolution on summary judgment.

---

[78]   *Id.* at 22–23.

[79]   ECF 226-4 (SEALED), ¶¶ 12–25.

4.      **Aspen's Motion for Summary Judgment**

On June 7, 2021, Aspen filed its motion for summary judgment.[80] On June 28, Sava responded and Aspen replied on July 12.[81]

The excess policy issued by Aspen does not "drop down"—meaning it can only be invoked once the $15 million limit of liability under the Starr Policy has been exhausted.[82] Given the Court's rulings here, the scope of Aspen's motion is significantly narrowed. Sava is not entitled to coverage under the Starr Policy except as to the Government Funding Sublimit, but did not comply with the conditions precedent to suit under that sublimit. Sava therefore cannot exhaust the limits of the Starr Policy. Accordingly, the coverage provided under the Aspen policy has not been triggered and Aspen is entitled to judgment in its favor.

Aspen's motion for summary judgment is **GRANTED**.

B.      **Starr's and Aspen's Motions to Amend Counterclaims**

Starr and Aspen filed separate motions seeking to amend their counterclaims.[83] Sava opposes both requests.[84] Starr also contends in a notice that

---

[80]   ECF 332.

[81]   ECF 353; ECF 358.

[82]   ECF 243-4, at 5.

[83]   ECF 318; ECF 326.

[84]   ECF 329; ECF 337.

the draft report of the third-party ESI examiner supports its request to amend the counterclaims.[85] Sava asks the Court to disregard Starr's notice.[86]

### 1.    Legal Standard

After the time for amendment as a matter of course has expired, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Although the Court "should freely give leave when justice so requires" — *id.* — it may deny leave:

> [W]here there is substantial ground for doing so, such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment.

*Reese v. Herbert*, 527 F.3d 1253, 1263 (11th Cir. 2008) (cleaned up). *See also Foman v. Davis*, 371 U.S. 178, 182 (1962) (indicating undue delay is an appropriate basis on which to deny leave to amend); *Abramson v. Gonzalez*, 949 F.2d 1567, 1581 (11th Cir. 1992) (concluding "undue delay, undue prejudice to the defendants, and futility of the amendment" provided basis for trial court to deny leave to amend).

---

[85]   ECF 390 (Starr's First Notice of Supplemental Persuasive Authority).

[86]   ECF 392.

When a motion to amend is filed after the deadline set in a scheduling order, the movant must demonstrate good cause. *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998). *See also* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). Notwithstanding, the ultimate decision of whether to grant leave to amend remains committed to the Court's discretion. *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1240 (11th Cir. 2009); *Shipner v. E. Air Lines, Inc.*, 868 F.2d 401, 406 (11th Cir. 1989).

While the parties seem to agree that Rule 15 controls, the Court is not convinced. Starr contends it is not seeking leave to amend after a scheduling order deadline because "no such deadline exists."[87] The initial Scheduling Order directs that the time limits for, among other things, amending pleadings "are as stated" in the Joint Preliminary Report and Discovery Plan (the Joint Report).[88] While both Starr and Sava indicated in the Joint Report that they anticipated the need to amend their pleadings, neither proposed any date by which such amendments should be filed.[89] This would not have had the effect of removing any deadlines as Starr now contends. Rather, it would have left in place the deadline under the local

---

[87]   ECF 318, at 11.

[88]   ECF 23 (referring to ECF 18).

[89]   ECF 18, at 8–9.

rules for amending pleadings—30 days after the start of discovery.[90] Regardless, because the motions for leave cannot survive even under the less onerous requirements of Rule 15, the Court need not analyze whether they pass muster under Rule 16.

### 2.    Discussion

Starr seeks leave to assert claims for fraudulent inducement, misrepresentation, and recission against Sava. For its part, Aspen adopts and incorporates Starr's motion in an effort to add similar claims against Sava and amend portions of its Answer. Starr argues that it obtained evidence through discovery showing that Sava made intentional, material misrepresentations to both it and the United States as to its financial condition. Sava contends the Insurers should not be granted leave for two reasons: (1) their requests are untimely and (2) the amended counterclaims are futile. The Court agrees that the requests should have been brought long ago, and therefore denies the sought-after leave. As a result, a discussion of futility is unnecessary in this regard. It is, however, important to Sava's motion for sanctions and is thus discussed below.[91]

---

[90]   *Id.* at 9 (citing LR 7.1A(2), NDGa).

[91]   *See infra* Section II.C.2.

Although generally "the mere passage of time, without more, is an insufficient reason to deny leave to amend . . . *undue* delay may clearly support such denial." *Hester v. Int'l Union of Operating Eng'rs, AFL-CIO*, 941 F.2d 1574, 1578–79 (11th Cir. 1991) (citation omitted) (cleaned up). "Eleventh Circuit cases upholding denials of leave to amend based on undue delay [usually] involve delays measured in years and/or extending beyond key deadlines." *Williams v. Select Portfolio Servicing, Inc.*, No. 1:15-cv-03791-RWS-RGV, 2016 WL 9450469, at *5 (N.D. Ga. Dec. 20, 2016). S*ee also Campbell v. Emory Clinic*, 166 F.3d 1157, 1162 (11th Cir. 1999) ("Prejudice and undue delay are inherent in an amendment asserted after the close of discovery and after dispositive motions have been filed, briefed, and decided.") (citation omitted).

Here, the original Complaint was filed on May 7, 2018, and Starr and Aspen answered and filed counterclaims on July 16, 2018.[92] Under the Court's local rules then, discovery started on August 15, 2018. LR 26.2, NDGa ("The discovery period shall commence thirty days after the appearance of the first defendant by answer to the complaint."). Fact discovery ended on March 31, 2021; expert discovery was

---

[92]   ECF 1; ECF 7.

to be completed by June 30, 2021.[93] The Insurers filed their motions for leave *after* the close of fact discovery and shortly before the end of expert discovery.[94]

As boiled down by its counsel during oral argument, Starr asserts that Sava's unaudited financials (on which Starr relied in providing Sava insurance) were wrong in various areas—to the tune of millions of dollars. Starr contends the unaudited numbers were clearly wrong based on the audited figures that were released later. Starr also claims that Sava misrepresented the status of a government investigation (purportedly misleading Starr into thinking the investigation was nearly complete). Starr argues that it first obtained the information to bring its proposed new claims in April 2021, after the depositions of two key Sava witnesses who purportedly provided the necessary factual basis to show Sava's financial misrepresentations were intentional.[95]

Sava points out, however, that Starr had the unaudited financials long before this suit was initiated and received the audited financials in March 2019,

---

[93] ECF 239.

[94] ECF 318 (Starr motion filed May 14, 2021); ECF 326 (Aspen motion filed May 26, 2021). Nothing in the third-party examiner's draft report changes the timing of these events—regardless of what documents may not have been preserved by Sava or the reasons for that failure [ECF 390-1]. To the extent Starr seeks relief in its "notice" [ECF 390], the request is **DENIED**.

[95] ECF 318, at 5–6.

during discovery.[96] And the document in which Sava purportedly misrepresented the status of the government investigation was produced in August 2018.[97] Sava suggests that Starr is attempting to sandbag it by waiting until after depositions and the close of fact discovery to add these new claims.[98]

The Court agrees with Sava. Starr and Aspen long ago had the information necessary to appropriately allege that Sava's financial information was fraudulent, had been misrepresented, and provided a basis to seek recission of the insurance agreements. The magnitude of the alleged misstatements alone (reducing amounts from tens of millions of dollars to negative amounts in some instances[99]) was more than enough for the Insurers to have concerns about the accuracy of the numbers on which they relied. *See, e.g., Carley Cap. Grp. v. Deloitte & Touche, L.L.P.*, 27 F. Supp. 2d 1324, 1339 (N.D. Ga. 1998) (citations omitted) ("While alleging a misapplication of Generally Accepted Accounting Principles standing alone is insufficient, such allegation when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter.") (disapproved on

---

[96]   ECF 330 (SEALED), at 12.

[97]   *Id.*

[98]   *Id.*

[99]   *See, e.g.*, ECF 319 (SEALED), at 18.

other grounds by *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1205 (11th Cir. 2001)); *In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1371–72 (N.D. Ga. 2004) (same) (citing cases). The same is true of the alleged misrepresentation about the status of the government investigation. The Insurers have long been in possession of the information on which they belatedly seek leave to amend.

The information that was already in Starr's and Aspen's possession, coupled with the documents produced during discovery, provided a sufficient basis to allege intent or knowledge generally, as permitted under Fed. R. Civ. P. 9(b). And the Insurers have had such information since at least March 2019. In fact, Aspen raised an affirmative defense in *2018* that "coverage under the Aspen Policy may be barred to the extent Aspen relied upon inaccurate or incomplete statements or representations made by Sava in connection with the issuance of the Aspen Policy."[100] Aspen also raised this as one of its counterclaims.[101] This years'-long delay alone is sufficient to reject the attempt to add new claims at this stage. *Foman*, 371 U.S. at 182; *Reese*, 527 F.3d at 1263.

Starr's and Aspen's motions to amend their counterclaims are **DENIED**.

---

[100]   ECF 46, at 18 (Eleventh Defense).

[101]   *Id.* at 23 ¶ H.

### C.     Sava's Motion for Sanctions

On June 28, 2021, Sava moved for sanctions against Starr and its counsel under Rule 11—asserting that they intentionally included false or misleading statements in Starr's motion for leave to amend its counterclaims.[102] Starr opposed the motion on July 12.[103] Sava replied on July 20.[104] Sava also included additional arguments in support of its sanctions motion in its request that the Court disregard Starr's notice concerning the third-party ESI examiner's draft report.[105]

### 1.     Legal Standard

"The purpose of Rule 11 is to deter baseless filings in district court and thus streamline the administration and procedure of federal courts." *Peer v. Lewis*, 606 F.3d 1306, 1311 (11th Cir. 2010). Sanctions may be appropriate:

> (1) when a party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; or (3) when the party files a pleading in bad faith for an improper purpose.

---

[102]  ECF 347.

[103]  ECF 361. Starr's motion [ECF 363] to file under seal its unredacted response to Sava's motion for sanctions and certain exhibits thereto is **GRANTED**.

[104]  ECF 371. Sava's motion [ECF 374] to file under seal its unredacted reply in support of its motion for sanctions is **GRANTED**.

[105]  ECF 392.

*Massengale v. Ray*, 267 F.3d 1298, 1301 (11th Cir. 2001) (quoting *Worldwide Primates,*

*Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996)).

The Rule 11 inquiry is governed by an objective standard that does not

require a finding of bad faith. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991). *See*

*also Anderson v. Smithfield Foods, Inc.*, 353 F.3d 912, 915 (11th Cir. 2003) ("The

standard for testing conduct under amended Rule 11 is reasonableness under the

circumstances."). Courts in the Eleventh Circuit analyze two factors: "(1) whether

the party's claims are objectively frivolous; and (2) whether the person who signed

the pleadings should have been aware that they were frivolous." *Baker v. Alderman*,

158 F.3d 516, 524 (11th Cir. 1998). To determine if a claim is objectively frivolous,

the Court looks to "whether a reasonable attorney in like circumstances could

believe his actions were factually and legally justified." *Kaplan v. DaimlerChrysler,*

*A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003). Sanctions should not be imposed if "the

evidence supporting the claim is reasonable, but simply 'weak' or 'self-serving.'"

*Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 665 (11th Cir. 2010) (Tjoflat, J.,

concurring in part and dissenting in part).

### 2.   Discussion

Sava    contends    Starr's    allegations    concerning    the    intentional

misrepresentation of financial information are entirely baseless, fraudulent, and

untethered to the facts. Sava posits a nefarious motive on Starr's part. Such hyperbole is unwarranted. Starr has pointed to several instances of substantial discrepancies between Sava's unaudited and audited financial information. For instance, the numbers provided to the United States do not match those conveyed to Starr at or around the same period of time. Sava maintains there are perfectly legitimate reasons for the differences. There may well be. But that does not mean Starr's allegations are inherently spurious.

Sava emphasizes that some of the financial information was unaudited and included prospective forecasts. This may be true. But the differences in the audited and unaudited figures alone provide a reasonable basis to question Sava's conduct and motives. And while Starr's efforts to add these new claims come too late for the Court to grant leave to amend, the allegations themselves are reasonably grounded in the factual record and plausibly supported. The Court discerns no bad faith motive in Starr's request for leave to amend, and certainly nothing worthy of sanction.

In its motion to disregard Starr's notice concerning the third-party ESI examiner's draft report, Sava asserts that recent conduct further demonstrates why

Starr and its attorneys should be sanctioned.[106] According to Sava, Starr's notice concerning the third-party examiner's draft report violates the Court's May 27, 2021 discovery order and an agreement the parties reached with the Special Master concerning that report.[107] The Court agrees that counsel for Starr's conduct in this regard was unprofessional and improper.

In their haste to make sure the Court learned of the highly disputed contents of the examiner's report before ruling on the pending motions, Starr's counsel clearly overstepped. First, as Sava points out, the draft report is not additional legal authority. Second, the report is not final and (as Sava also points out) it is the subject of an intense dispute among the parties. Third, by trying to gain a strategic advantage with the Court, Starr's counsel tried to bypass entirely the parties' disputes about the scope and process used by the examiner—which involved the examiner's improper review of and reliance on Sava's privileged documents, as well as the examiner's apparent disregard for the confines of the Court's May 27 Order.[108]

---

[106]   ECF 392.

[107]   ECF 392-1, at 2–3.

[108]   ECF 328.

The Court does not condone this conduct but does not believe the actions of Starr and its counsel warrant monetary sanctions. Their attempt to undermine Sava's position in the current dispute about the examiner's review cannot, however, be overlooked. To avoid any possible prejudice to Sava, the Court **GRANTS** Sava's request that it disregard Starr's notice concerning the examiner's draft report and **DIRECTS** the Clerk to **STRIKE** from the docket the unredacted notice and draft report [ECF 390]; the Court **DENIES** Sava's motion [ECF 392] in all other respects.[109]

Sava's motion for sanctions [ECF 347] is **DENIED**.

## III.   CONCLUSION

Starr's motion for summary judgment [ECF 207] is **GRANTED IN PART and DENIED IN PART**; Sava's motion for partial summary judgment [ECF 243] is **DENIED**; Aspen's motion for summary judgment [ECF 332] is **GRANTED**; Starr's motion to amend its counterclaims [ECF 318] is **DENIED**; Aspen's motion to amend its counterclaim [ECF 326] is **DENIED**; Sava's motion for sanctions [ECF 347] is **DENIED**; Starr's motion to continue [ECF 369] is **DENIED AS MOOT**; Starr's motion to disregard [ECF 377] is **DENIED**. Any relief sought in

---

[109]   Starr's motion to file under seal the notice and third-party ESI examiner's draft report [ECF 391] is **DENIED as moot**.

Starr's "notice" [ECF 390] is **DENIED**. Sava's motion to disregard [ECF 392] is **GRANTED in part** and **DENIED in part**; the Court has not considered the contents of the third-party ESI examiner's draft report for purposes of this Order. The Clerk shall **STRIKE** ECF 390 from the docket and the accompanying motion to seal [ECF 391] is **DENIED as moot**. The remaining motions to file under seal [ECF 360; ECF 363; ECF 374; ECF 383; ECF 388] are **GRANTED**. Starr's motion to redact the oral argument transcript [ECF 385] is **GRANTED in part** and **DENIED in part**. Because these rulings also dispose of all of the counterclaims asserted by Starr and by Aspen, the Clerk is **DIRECTED** to enter **JUDGMENT** in their favor and close this case.

     **SO ORDERED** this the 27th day of September 2021.

Steven D. Grimberg
United States District Court Judge